Timothy W. **JEPSON**, Respondent,

v.

**GENERAL CASUALTY COMPANY OF WISCONSIN**, Petitioner, Appellant.

No. C7–92–1846.

Supreme Court of Minnesota.

March 25, 1994.

Steven J. Cahill, Cahill & Marquart, PA, Moorhead, for appellant.

Robert Feder, Wold, Feder & Schimmelpfennig, P.C., Fargo, ND and Leslie A. Krisin, Mariscal, Weehe, McClnyrf & Friedlander, P.A., Phoenix, AZ, for respondent.

## OPINION

PAGE, Justice.

General Casualty of Wisconsin seeks review of a court of appeals decision affirming the trial court's decision in a declaratory judgment action brought by Timothy Jepson. The trial court concluded that Jepson was entitled to Minnesota underinsured motorist benefits as a result of a 1983 auto accident. The court's conclusion was based on its determination that Minnesota, and not North Dakota, law applied to the anti-stacking provisions in the policy. The trial court also concluded, and the court of appeals affirmed, that under Minnesota law Jepson could stack the benefits on each of the seven vehicles insured under the policy. At the time of the accident, North Dakota law would enforce the anti-stacking provisions in the policy while Minnesota law would not. Our choice of law analysis mandates the application of North Dakota law.[1] We, therefore, vacate the judgment and remand to the trial court.

In March of 1983, Jepson purchased a general liability automobile insurance contract through the Dilworth Agency, Inc., Dilworth, Minnesota, providing coverage from General Casualty. Issued on April 7, 1983, the policy was effective from March 18, 1983, to March 18, 1984. The named insureds were Timothy and Deborah Jepson, National Muffler Shops, Inc., and National Muffler Warehouses, Inc. National Muffler Shops, Inc.'s address, at 72 North Second Street, Fargo, North Dakota 58102, was listed in the policy as the address for the named insureds. National Muffler Shops, Inc. and National Muffler Warehouses, Inc. are North Dakota corporations which do business in North Dakota.

The policy covered seven vehicles. Six of the vehicles were registered in North Dakota, and one was registered in Indiana. None of the vehicles were registered in Minnesota. All but two of the vehicles were registered in the name of either National Muffler Shops, Inc., or National Muffler Warehouses, Inc., the exception being a Corvette registered to Deborah Jepson at the National Muffler Shops' address and a GMC pick-up truck registered to Jepson's nephew at the same address.

The policy premium was calculated at North Dakota rates and paid by one of the corporations. Testimony indicated that it was General Casualty's practice to insure vehicles in the state where they were titled, that Minnesota insurance rates were substantially higher than North Dakota rates, and that, had the policy been written at higher rates, the insurance agent might have lost the sale.

The policy included a North Dakota Amendment of Cancellation Condition Endorsement and a North Dakota Basic Personal Injury Protection Endorsement.

---

1. Because we find that North Dakota law applies, we do not reach the issue of which vehicles could be stacked under the policy.

Apart from these references, the policy does not indicate that it is a North Dakota policy. Jepson notes that the general policy change coding sheets reference state 22. The number 22 appears to be General Casualty's code for Minnesota.

Jepson testified that he specifically asked for underinsured and uninsured motorist coverage, and the policy purchased provided $100,000 per person/$300,000 per accident for underinsured and uninsured coverage. The policy prohibits stacking of the underinsured and uninsured benefits.

On December 18, 1983, Jepson and his wife were riding as passengers in a real estate agent's car in Phoenix, Arizona, when they were involved in a traffic accident. At the time, they were looking to purchase a home in Phoenix for reasons related to Jepson's health. The person who caused the accident had insurance with a liability limit of $250,000. Jepson settled with that individual for the policy limits. Jepson also received $100,000 from the coverage on the car in which he was riding.

Jepson applied for and received no-fault benefits from General Casualty under the North Dakota no-fault law. A dispute arose between Jepson and General Casualty regarding medical expenses payable under the personal injury protection coverage of the policy. As a result of that dispute, Jepson brought suit against General Casualty in North Dakota, claiming entitlement to North Dakota personal injury protection benefits. A summons and complaint dated September 24, 1985, were served on General Casualty. The lawsuit was settled prior to being filed in the district court. Jepson was represented in that matter by the same counsel representing him in this action.

In June of 1991, Jepson brought a declaratory judgment action in Minnesota, seeking underinsured motorist benefits under the General Casualty policy, and insisting that those benefits be stacked. The declaratory judgment action went forward, and the trial court concluded that Minnesota law should be applied; the trial court further concluded that under Minnesota law Jepson would be allowed to stack benefits on all seven vehicles. General Casualty moved for amended findings, which motion was denied, and then General Casualty appealed to the court of appeals on four issues: adequacy of notice, whether Jepson had met his burden of production, choice of law, and the number of vehicles to be stacked. The court of appeals affirmed the trial court's decision. General Casualty presents two issues [2] for our review: (1) whether Minnesota law or North Dakota law governs the resolution of this underinsured motorist coverage dispute; and (2) if Minnesota law applies, how many of the insured vehicles may be stacked for purposes of underinsured motorist coverage. We reverse and remand.

■ In analyzing the choice of law issue, the first consideration is whether the choice of one state's law over another's creates an actual conflict. *Hague v. Allstate Insurance Co.*, 289 N.W.2d 43, 46–47 (Minn.1979) (citing *Myers v. Government Employees Insurance Co.*, 302 Minn. 359, 225 N.W.2d 238, 241 (1974)), affirmed 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). Here, North Dakota would enforce the anti-stacking provision in the policy, while under the law in effect at the time of the accident Minnesota would not. *St. Paul Mercury Insurance Company v. Andrews*, 321 N.W.2d 483, 489 (N.D.1982); *Wasche v. Milbank Mutual Insurance Company*, 268 N.W.2d 913, 919 (Minn.1978). Thus, an actual conflict exists.

Next, we must consider whether the law of both states can be constitutionally applied. The Supreme Court set out the test for constitutionality in *Hague:* "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *All-*

---

**2.** General Casualty's brief argued that an appellate court need not defer to a trial court's findings of fact that derived from documentary, as opposed to testamentary, evidence under Minn. R.Civ.P. 52.01. General Casualty is wrong. Minn.R.Civ.P. 52.01 (1994) explicitly permits an appellate court to overrule a trial judge's findings of fact only when those findings are clearly erroneous, regardless of whether the findings are based on documentary or testamentary evidence.

*state Insurance Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981).

■ Both Minnesota and North Dakota have sufficient contacts such that the law of either state could be constitutionally applied. Contacts with Minnesota include Jepson residing in Minnesota at the time the insurance contract was made and at the time of the accident, Jepson's purchase of the policy through a Minnesota agency, and the regular use of at least two of the covered vehicles in Minnesota. North Dakota contacts include all of the covered vehicles but one being registered in North Dakota,[3] the named insured's addresses being in North Dakota, and two of the named insureds were North Dakota corporations, located in North Dakota, and not registered or licensed to do business in Minnesota. Finally, one of those corporations paid the premiums on the insurance policy.

Having concluded that there is a conflict between Minnesota and North Dakota law and that either may be constitutionally applied, we next look to the five choice influencing factors set out in *Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408 (1973). They are: (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Milkovich,* 203 N.W.2d at 412. These five factors were put forward by Professor Leflar as a way of laying bare the reasons for choosing to apply one state's law over another. *See* Robert A. Leflar, *Choice–Influencing Considerations in Conflicts Law,* 41 N.Y.U.L.Rev. 267, 282 (1966); Robert A. Leflar, *Conflicts Law: More on Choice–Influencing Considerations,* 54 Calif.L.Rev. 1584, 1586–88 (1966). These factors were not intended to spawn the evolution of set mechanical rules but instead to prompt courts to carefully and critically consider each new fact situation and explain in a straight-forward manner their choice of law. *See Choice–Influencing Considerations in Conflicts Law* at 281–82; *Conflicts Law: More on Choice–Influencing Considerations* at 1598. The

lower courts need to wrestle with each situation anew. While prior opinions may be helpful to a court's deliberations, the court's obligation is to be true to the method rather than to seek superficial factual analogies between cases and import wholesale the choice of law analysis contained therein.

The trial court determined that the first factor, predictability, was not of great importance and the court of appeals agreed. General Casualty, however, contends that predictability is essential to insurance contracts and argues it reasonably expected its obligations to be governed by the law of the state where the contract was issued and where the insured property was generally located—North Dakota. The Jepsons argue that predictability of result favors Minnesota law because the policy was sold through a Minnesota agency, the Jepsons reside in Minnesota, and the policy covered at least two vehicles that were regularly driven from Minnesota residences to Jepson's place of business in Fargo.

This case involves the coverage an insurance policy provides for injuries suffered in an accident, and so has aspects of both contract and tort. Predictability of result as it relates to the tort aspect of a case is not of great importance in situations such as the one presented here because of the unplanned nature of automobile accidents. *Hime v. State Farm Fire & Casualty Company,* 284 N.W.2d 829, 833 (1979); *Hague,* 289 N.W.2d 43, 48 (1978). Predictability of result is of value in analyzing the contract aspects of a case. While where an accident occurs is unimportant, the obligations the insurer has to the insured at that time are important. The heart of the bargain between the insurer and the insured is the coverage the insured purchased. The parties enter into the insurance contract with the expectation that, should a dispute arise, the legal system will endeavor to give each side the benefit of their bargain. To the extent the choice of law in this case contributes to giving the parties the benefit of their bargain, it enhances the predictability of the parties' contractual arrangements.

**3.** One covered vehicle was registered and kept in Indiana.

Although the accident occurred in Arizona, nothing was planned or done by either of the parties with regard to the insurance contract that was in any way directed to that state. In considering the bargain between Jepson and General Casualty, we note it was based on a number of factors that could only reflect a mutual expectation that they had negotiated a North Dakota insurance contract. The insurance policy covered named insureds at a North Dakota address and North Dakota registered and titled vehicles. The premium charges for the coverage were calculated at North Dakota rates. These circumstances suggest what the parties' reasonable expectations should have been at the time of contracting. Perhaps the parties might have predicted that, had Jepson been injured in one of the vehicles in Minnesota, Minnesota law might be applied. It is unlikely the parties would have predicted Minnesota law would apply in such circumstances as occurred here, that is, where Jepson was injured while riding in another person's vehicle in a state other than Minnesota or North Dakota.

Differences among the states in their laws and in their choice of law methods make predicting what law will apply to a case an uncertain exercise. It is, however, desirable for the courts of different states to reach similar conclusions on the choice of law in a given dispute. We think it unlikely most other courts would apply Minnesota law on the facts before us. The factor of preserving the parties' justified expectations and enhancing the predictability of what state's law will govern in a contractual dispute points away from the application of Minnesota law.

In discussing the second factor, the maintenance of interstate order, we are primarily concerned with whether the application of Minnesota law would manifest disrespect for North Dakota's sovereignty or impede the interstate movement of people and goods. An aspect of this concern is to maintain a coherent legal system in which the courts of different states strive to sustain, rather than subvert, each other's interests in areas where

their own interests are less strong. Robert A. Leflar, *Choice–Influencing Considerations in Conflicts Law,* 41 N.Y.U.L.Rev. 267, 285–87 (1966). By approaching choice of law questions with these considerations in mind, the opportunities for forum shopping may be kept within reasonable bounds.

The trial court found that Minnesota had sufficient contacts with the case for this factor to weigh in favor of applying Minnesota law and the court of appeals concurred. General Casualty argues that the state whose law is ultimately applied should have the most significant contacts with the facts at issue. Minnesota, according to General Casualty, has minimal contacts with the facts, while both North Dakota and Arizona have far more significant contacts. For his part, Jepson argues that Minnesota has the most significant contacts and that it is irrelevant that the vehicles were registered in North Dakota or that their titles were held by North Dakota corporations. In support of this proposition, Jepson notes that in *Amco Insurance Company v. Lang,* 420 N.W.2d 895, 897 (Minn.1988), we observed that "it has been the rule in Minnesota that first party coverages follow the person, not the vehicle."

If the law of North Dakota promised Jepson a greater recovery than Minnesota, we doubt very much that he would be litigating this coverage dispute in our courts. People who purposefully seek advantages offered by another state ought not be allowed to avoid the burdens associated with their choice. We find evidence that Jepson is forum shopping in bringing this suit in our state's courts because he commenced, although settling prior to filing suit, litigation in North Dakota to secure no fault benefits payable under North Dakota law.[4] Minnesota does not have an interest in encouraging forum shopping, particularly where we would be sending a message to those people living on our borders to take advantage of the benefits our neighboring states offer in terms of lower insurance rates, lower vehicle registration fees, and sales taxes, and then, if they are injured,

---

4. To be eligible for the no fault benefits Jepson sought from General Casualty, North Dakota law requires an insured's vehicles be registered or principally garaged in North Dakota. N.D.C.C. §§ 26.1–41–02 (1987); 39–05–02.2 (1989).

take advantage of Minnesota's greater willingness to compensate tort victims. Minnesota does not have an interest in encouraging that conduct.

Further, Jepson's reliance on *Amco,* 420 N.W.2d 895 is misplaced. The analysis in that case has no bearing on the choice of law issue confronting us here. First, *Amco* was not a choice of law case. Second, Jepson unwarrantedly attempts to extend what we did say in *Amco.* It is true that in *Amco* we held that "in Minnesota * * * first party coverages follow the person, not the vehicle." *Amco,* 420 N.W.2d at 897. Illogically, Jepson contends this proposition means not only that coverage follows the person, but that the policy automatically becomes a Minnesota policy because one of the named insureds is a Minnesota resident. That is simply not true.

Unlike the trial court and court of appeals, we find that the maintenance of interstate order weighs in favor of applying North Dakota law. North Dakota has the authority to regulate the terms of insurance for vehicles licensed and titled in that state. We interfere with the sovereignty of a sister state when we make our law available for people who seek Minnesota benefits while burdening the North Dakota insurance rate base and regulatory system.

The third factor, simplification of the judicial task, is not a significant factor in this case because the law of either state could be applied without difficulty.

The fourth choice influencing factor is which choice of law most advances a significant interest of the forum. General Casualty argues that Minnesota has no legitimate interest in applying its law, especially since Jepson no longer resides in Minnesota. Jepson believes that because he was a domiciliary of Minnesota at the time of the accident, and more generally because he is a tort victim and Minnesota has a policy of compensating tort victims, it is in Minnesota's interest to apply its law.

Minnesota places great value in compensating tort victims. We have even refused to apply our law when the law of another state would better serve to compensate a tort victim. *Bigelow v. Halloran,* 313 N.W.2d 10,

12–13 (Minn.1981) (noting that Minnesota and Iowa both had significant contacts with the subject of litigation, but choosing Iowa law because it was the "better rule of law"). But, however significant Minnesota's interest in the compensation of tort victims, we have other interests which in situations like this one are in conflict with the value we place on victim compensation. For example, we also believe that people should get the benefit of the contracts they enter into, nothing less and nothing more. Were the only choice-influencing consideration in this case our governmental interest, we might side with Jepson. On the facts of this case, however, our choice is influenced more by our analyses of predictability and maintenance of the interstate order than it is by our governmental interest in compensating a tort victim.

The final choice influencing factor to consider is whether, in an objective sense, North Dakota or Minnesota has the better rule of law. At the time of Jepson's accident, Minnesota law would not enforce the anti-stacking provision in the insurance policy while North Dakota would. In 1985, the legislature amended the law to prohibit stacking. Act of June 27, 1985, First Special Session, ch. 10, § 68, *codified at* Minn.Stat. § 65B.49, subd. 3a(6) (1992). General Casualty claims that to allow stacking cannot be considered the better rule of law precisely because Minnesota has banned stacking. As authority for this point, General Casualty relies on *Stenzel v. State Farm Mutual Automobile Insurance Company,* 379 N.W.2d 674 (Minn.App.1986), where the court of appeals reasoned that the 1985 amendment prohibiting stacking should be regarded as the better rule of law: "[n]ow that the legislature has spoken, we must follow its assessment of the 'better rule.'" *Stenzel* at 676. Jepson counters that he is entitled to the benefit of the law that existed at the time of his injury. He relies on *Wille v. Farm Bureau Mutual Insurance Company,* 432 N.W.2d 784 (Minn.App.1988), where the court of appeals concluded the 1985 amendment prohibiting stacking did not require it to enforce anti-stacking provisions that violated Minnesota policy when the insurance contract was made. *Wille* at 787–88.

The trial court found, and the court of appeals apparently agreed, that Minnesota's treatment of stacking at the time of the accident is the better rule of law. On our reading of the cases and briefs, however, neither *Stenzel*, nor *Wille*, nor the parties offer a compelling explanation of exactly why stacking or anti-stacking is a better rule. *Stenzel* wrongly asserts that, because the legislature prohibited stacking, we must find it to be the better rule of law. *Stenzel*, 379 N.W.2d at 676. If that were true, forum law would always be the better law and this step in our choice of law analysis would be meaningless. *Wille* simply states that because stacking provides greater compensation, it is a better rule. *Wille*, 432 N.W.2d at 786.

Leflar intended the better rule of law to be the rule that made "good socio-economic sense for the time when the court speaks." Robert A. Leflar, *Conflicts Law: More on Choice–Influencing Considerations*, 54 Calif.L.Rev. 1584, 1588 (1966). We disagree with the views expressed in *Stenzel* and *Wille*, as well as by the parties, as to which is the better rule of law. From our present day vantage point, neither the law Minnesota had then, nor the law we have now, is clearly better. Sometimes different laws are neither better nor worse in an objective way, just different. Because we do not find either stacking or anti-stacking to be a better rule in the sense Leflar intended, this consideration does not influence our choice of law.

We hold that North Dakota law applies to Jepson's stacking claim. So deciding, the issue of how many vehicles may be stacked under the policy is moot.

Reversed and remanded to the trial court.