MEDICAL GRAPHICS CORPORATION,
Plaintiff,

v.

HARTFORD FIRE INSURANCE COMPANY, a subsidiary of ITT Hartford Insurance Group, Inc., Defendant.

Civ. No. 4–96–440 (JRT/RLE).

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 10, 1997.

---

Alan M. Anderson, Bloomington, MN, for Plaintiff.

James T. Martin, Edina, MN, for Defendant.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Motion of the Defendant Hartford Fire Insurance Company ("Hartford") for Leave to Amend its Answer in order to add two additional affirmative defenses.

A Hearing on the Motion was conducted on January 6, 1997, at which time the Plaintiff Medical Graphics Corporation ("MedGraphics") appeared by Alan M. Anderson, Esq., and Hartford appeared by James T. Martin, Esq.

For reasons which follow, the Motion is granted in part and denied in part.

1. In a *Miller–Shugart* settlement, a plaintiff settles with a tortfeasor but agrees that the Judgment will only be collected from the proceeds of any applicable insurance policy. In *Miller v. Shugart,* 316 N.W.2d 729, 734 (Minn.1982), the

### II. *Factual and Procedural History*

In December of 1995, MedGraphics entered into a *Miller–Shugart* –type [1] settlement with SensorMedics Corporation ("SensorMedics"), which terminated an action that MedGraphics had commenced against SensorMedics, involving claims that SensorMedics had engaged in patent infringement, antitrust activities, and unfair competition. As part of that settlement, SensorMedics agreed to the entry of Judgment against it for $250,000, in return for which MedGraphics agreed to release SensorMedics from liability, and to seek satisfaction of the Judgment from Hartford, which had issued a policy of insurance to SensorMedics. We are advised that, after having spent approximately $400,000.00 in defense costs, Hartford declined to participate in the settlement. As the assignee of SensorMedics, MedGraphics commenced this action, seeking to recover any available insurance proceeds pursuant to the *Miller–Shugart* settlement.

On August 2, 1996, our predecessor, Magistrate Judge John M. Mason, issued a Scheduling Order which directed that all Motions to Amend the pleadings should be served by September 1, 1996, and that discovery would close on November 15, 1996. By stipulation, Hartford filed its First Amended Answer on September 3, 1996. Thereafter, the parties agreed to extend the discovery deadline to December 15, 1996.

By this Motion, which was filed on December 13, 1996, Hartford seeks to amend its Answer so as to allege two affirmative defenses, each of which is based upon the terms of the insurance policy that it had issued to SensorMedics. The first of the proposed defenses seeks to assert that Hartford is not bound by the underlying settlement because the settlement was without Hartford's consent. As for the second proposed defense, Hartford contends that SensorMedics failed to honor the provision, in the applicable policy, which required SensorMedics to cooper-

Minnesota Supreme Court upheld this type of settlement, concluding that an insured does not breach its duty to cooperate with the insurer by settling with the plaintiff prior to a determination of the policy's coverage.

ate with Hartford in the conduct of their joint defense.

## III. *Discussion*

A. *Standard of Review.* Where, as here, the parties have exchanged their initial round of pleadings, Rule 15(a), Federal Rules of Civil Procedure, describes the appropriate procedure for amending a pleading as follows:

> * * * [A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. * * *

In construing this Rule, the Supreme Court has observed:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); see also, *Thompson–El v. Jones,* 876 F.2d 66, 67 (8th Cir.1989).

It is well-settled that leave to amend an Answer should be denied if the proposed defenses are legally insufficient. As one Court has properly observed, "[i]f the amended defenses are legally insufficient so as to invite a motion to strike under Rule 12(f) * * * it would serve no purpose to allow the amendment over the plaintiff's objections." *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423 F.Supp. 780, 783 (D.Conn.1976); see also, *Federal Deposit Ins. Corp. v. Coble,* 720 F.Supp. 748, 750 (E.D.Mo.1989) (noting that standards for granting motion to strike and motion for leave to amend "collapse into an inquiry as to the legal sufficiency of the proposed amendment"); *3 J. Moore, Federal Practice* ¶ 15.08[4], at 15–81 ("If a proposed amend-

ment is objected to on the ground of legal insufficiency, the court should apply the same test that is uses when the legal sufficiency of a pleading is challenged under Rule 12(b)(6) or (f)."); cf., *Humphreys v. Roche Biomedical Laboratories, Inc.,* 990 F.2d 1078, 1082 (8th Cir.1993) (standard applied in futility analysis is the same as that invoked in a Motion to Dismiss).

In considering the propriety of an amendment to a pleading, the policy of the Federal Courts, as exhorted by the Federal Rules, is to "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits," and to avoid an approach which would relegate the process to "a game of skill in which one misstep by counsel [might] be decisive to the outcome." *Foman v. Davis,* supra, at 181–82, 83 S.Ct. at 230, quoting *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

 . In the final analysis, the granting of a Motion to amend the pleadings is vested in the sound discretion of the Trial Court. *Ryan v. Sargent,* 969 F.2d 638, 641 (8th Cir.1992), cert. denied, 506 U.S. 1061, 113 S.Ct. 1000, 122 L.Ed.2d 150 (1993); *Thompson–El v. Jones,* supra at 67, citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971).

B. *Legal Analysis.* MedGraphics contends that the proposed affirmative defenses are not only futile, but also untimely, and that, to grant the Defendant's Motion, would cause it to suffer substantial prejudice. We consider the proposed defenses *seriatim.*

1. *The "No-action" Clause.* By its proposed Amended Answer, Hartford seeks to incorporate a policy provision which preconditions a Judgment creditor's suit on "a final judgment against an insured obtained after an actual trial" or "a settlement and release of liability signed by [Hartford], the insured, and the claimant (hereafter, the "no-action clause")." See, *Hartford's Proposed Amended Answer.* According to Hartford, an action to recover on the Judgment against SensorMedics would not meet the requirements of the no-action clause because Hartford did not sign the settlement agreement, and the

Judgment was not entered after an actual Trial.

In opposition, MedGraphics maintains that the policy should be interpreted under Minnesota law and, consistent with this interpretation, the proposed "no-action" defense is legally insufficient. To support its view of Minnesota law, MedGraphics relies on *Miller v. Shugart*, 316 N.W.2d 729 (Minn.1982), which involved a no-action clause that was identical to the provision at issue here, insofar as the clause purported to preclude an action against an insurer "until the amount of the insured's obligation to pay shall have been fully determined either by judgment against the insured after actual trial or by written agreement by the insured, the claimant and the company." *Id.* at 736 n. 7. As here, in *Shugart*, the plaintiff and the insured entered into a settlement while the insurer contested the coverage issue under the applicable insurance policy. *Id.* at 732. Although there had not been an actual Trial, and even though the insurer had not joined in the settlement, the Court held that the plaintiff could enforce the stipulated Judgment against the insurer so long as the plaintiff could establish that the underlying settlement was not obtained by fraud or collusion, and that the settlement was reasonable and prudent. *Id.* at 733–34.

■ As a consequence of the Court's holding in *Shugart*, even in the presence of a no-action clause, "a settlement agreement in which an insured stipulates to a money judgment in favor of a plaintiff, and the plaintiff releases the insured from personal liability, is enforceable against the insurer if (1) the insurer receives notice of the agreement; (2) the agreement is reasonable; and, (3) the agreement is not the result of fraud or collusion." *Brownsdale Co-op. Ass'n v. Home Ins. Co.*, 473 N.W.2d 339, 341 (Minn.App. 1991), rev. denied (Minn., September 25, 1991), citing *Miller v. Shugart*, supra at 732–33; see also, *Koehnen v. Herald Fire Ins. Co.*, 89 F.3d 525, 529 (8th Cir.1996) ("judgment-creditor plaintiff must prove not only insurance coverage, but also the absence of

fraud or collusion and that the *Miller–Shugart* settlement is reasonable"). Accordingly, to the extent that Minnesota law should apply to this action, we conclude that Hartford's proposed defense is legally insufficient.[2] See, *Dabney v. Montgomery Ward & Co., Inc.*, 761 F.2d 494, 500 (8th Cir.1985) (since the defense of contributory negligence was not available to a manufacturer in strict liability under governing State's law, manufacturer's request to amend its Answer, in order to add the affirmative defense of comparative fault, was properly rejected), cert. denied, 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985).

Rather than to distinguish *Shugart*, Hartford contends that the Plaintiff's claim is governed by California law, and that, "in a factual setting similar to the one that is present here," California law would give effect to the no-action clause, and would preclude the enforcement of the *Miller–Shugart* settlement, in any direct action against Hartford. *Hartford's Memorandum in Support of Motion to Amend*, at p. 4. As a threshold consideration, therefore, we must determine whether the laws of Minnesota, or those of California, should properly control the interpretation of the insurance policy at issue.

■ Of course, a Federal Court, which has jurisdiction over a case by virtue of the diversity of the parties' citizenship, must apply the forum State's conflict of law rules. *Schoffman v. Central States Diversified, Inc.*, 69 F.3d 215, 219 n. 10 (8th Cir.1995), citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). In applying Minnesota's choice of law rules, the first consideration is whether "the choice of one state's law over another's creates an actual conflict." *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 29 (Minn.1996), citing *Jepson v. General Cas. Co. of Wisconsin*, 513 N.W.2d 467, 469 (Minn. 1994). Otherwise stated, if the difference between the laws of California, and those of Minnesota, would not affect the ultimate rights of the parties, "then a conflict in the

---

**2.** Up to this point, Hartford does not appear to challenge this analytical result, as it has failed to draw any authority to our attention which over-

rules, or substantially undermines, the Minnesota Supreme Court's holding in *Shugart*.

laws is not presented." *Bouchard v. King,* 870 F.Supp. 269, 272 (D.Minn.1994).

As we have already noted, under Minnesota law, it is clear that the no-action clause, as contained in Hartford's policy, is unenforceable. In contrast, California's law on this point is unsettled. To support its view of California law, Hartford cites *Smith v. State Farm Mutual Automobile Ins. Co.,* 5 Cal.App.4th 1104, 1114, 7 Cal.Rptr.2d 131, 137 (1992), in which a California Court of Appeals concluded that a Judgment against the insured is a condition precedent to an insured's right to assign its claims against the pertinent insurer. As here relevant, the Court held that a stipulated Judgment, which contained a covenant not to execute, would not bind the insurer because "it does not represent a recovery that will trigger a duty to indemnify, that is, a recovery imposing liability." *Id.* at 1114, 7 Cal.Rptr.2d at 137. The Court reasoned that a "covenant not to execute shields the insured from such liability." *Id.* In the Court's view, the risk that evidence of insurance coverage would be introduced at Trial, that the issue of the insured's liability would be removed from the adversarial context, and that excess insurers would be unfairly prejudiced, were considerations which outweighed any public policy in encouraging settlements, and in equalizing an insured's bargaining power. *Id.* at 1112, 7 Cal.Rptr.2d at 136; see also, *Somerset South Properties v. American Title Ins.,* 873 F.Supp. 355, 358 (S.D.Cal.1994) (applying California law, the Court invalidated an insured's assignment of its claim against its insurer, since the insured and assignee had entered into a stipulated Judgment with a covenant that the assignee would not execute the Judgment against the insured); *Rose v. Royal Ins. Co.,* 2 Cal.App.4th 709, 715, 3 Cal.Rptr.2d 483, 486 (1992) (enforcing a no-action clause on the ground that a Judgment obtained in the settlement of a claim would not protect an insurer against collusion), rev. denied (Cal., Feb. 27, 1992).

Since *Smith,* however, the California Courts of Appeal appear to have moved their focus from the validity of the assignment to a consideration of whether the Judgment was fair and reasonable, and otherwise free from fraud and collusion. In *Pruyn v. Agricultural Insurance Co.,* 36 Cal.App.4th 500, 42 Cal.Rptr.2d 295 (1995), a California Appellate Court prescribed the following procedure for determining whether an insurer should be bound by a Judgment agreed upon by the insured and the plaintiff-assignee:

> [W]hen * * * a liability insurer wrongfully denies coverage or refuses to provide a defense, then the insured is free to negotiate the best possible settlement consistent with his or her interests, including a stipulated judgment accompanied by a covenant not to execute. Such a settlement will raise an evidentiary presumption in favor of the insured (or the insured's assignee) with respect to the existence and amount of the insured's liability. The effect of such a presumption is to shift the burden of proof to the insurer to prove that the settlement was unreasonable or the product of fraud or collusion. If the insurer is unable to meet that burden of proof then the stipulated judgment will be binding on the insurer and the policy provision proscribing a direct action against an insurer except upon a judgment against the insured after an "actual trial" will not bar enforcement of the judgment.

*Id.* at 509, 42 Cal.Rptr.2d at 299.

According to the *Pruyn* Court, "[i]n no other way can the courts give any meaningful protection to an insured who is abandoned by a liability insurer * * * and at the same time provide to the insurer some measure of procedural due process in order to protect against the consequences of a fraudulent or collusive settlement." *id.* at 530, 42 Cal. Rptr.2d at 313.

By all appearances, the procedure outlined in *Pruyn,* by which to enforce an agreed upon Judgment against an insurer, is similar to the mechanism set forth in *Miller v. Shugart,* supra. Under either Court's reasoning, unless the insurer is able to establish fraud, collusion, or can demonstrate that the settlement was unreasonable, an insurer cannot avoid liability simply by relying upon a "no action" clause. In view of the fact that *Pruyn* was only recently decided, and that the California Supreme Court has not addressed the apparent conflict between *Pruyn*

and *Smith v. State Farm Mutual Automobile Ins. Co.*, we cannot say, with any comfortable degree of confidence, that the laws of California and Minnesota are the same, or that they would produce the same result when applied to the facts of this case. Because the law of California is uncertain, there is "a potential of actual conflict," and we must engage in a choice of law analysis. *Potomac Elec. Power Co. v. California Union Ins. Co.*, 777 F.Supp. 968, 972 (D.D.C. 1991); see also, *American States Ins. v. Mankato Iron & Metal*, 848 F.Supp. 1436, 1443 (D.Minn.1993) ("To the extent that there is no law on the issue, the law is considered uncertain and in conflict with Minnesota law, which is settled."); *Carey Canada, Inc. v. Aetna Casualty & Sur. Co.*, No. 84–3113, 1988 WL 169287, at *2 (D.D.C., Mar. 31, 1988) (when the law of one jurisdiction is clear and the other is uncertain, a conflict exists).[3]

Having presumed that a conflict exists, we next consider "whether the law of both states can be constitutionally applied." *Jepson v. General Cas. Co. of Wisconsin,* supra at 469. "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Insurance Co. v. Hague,* 449 U.S. 302, 313–14, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981). In contrasting the pertinent contacts with each State jurisdiction, we note that the underlying settlement agreement was negotiated in Minnesota; that the agreement ended an action that was filed and litigated in Minnesota, and was governed by Minnesota law; that MedGraphics is a Minnesota Corporation; and that Hartford does business and has offices within Minne-

sota. As for California, we are advised that the underlying liability policy was issued, in California, to SensorMedics, which is a California corporation. Accordingly, we conclude that both California and Minnesota have sufficient contacts to justify, without offending the principles due process, the application of either State's law.

■ Under such circumstances, where the law of either State may be constitutionally applied, the Minnesota Courts have adopted Professor Leflar's "choice-influencing" methodology. See, *Klimstra v. Granstrom,* 95 F.3d 686, 690–91 (8th Cir.1996), citing *Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408, 412–13 (1973). The factors to be considered include: 1) predictability of results; 2) maintenance of interstate order; 3) simplification of the judicial task; 4) advancement of the forum's governmental interest; and 5) application of the better rule of law. *Id.*[4]

■ Hartford asserts that the first factor—the predictability of the result—weighs heavily in favor of the application of California law. The objective of this factor "is to fulfill the parties' justified expectations." *Jepson v. General Cas. Co. of Wisconsin,* supra at 470. Hartford argues that it reasonably expected its obligations to be governed by California law, since the policy was issued in that State. However, in *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.,* 726 F.Supp. 740, 744 (D.Minn.1989), aff'd, 920 F.2d 487 (8th Cir.1990), the Court rejected an argument that closely parallels that which Hartford urges here.

There, the insurers of a manufacturer, which had been found liable to a Minnesota resident for an accident that occurred in Minnesota, sought a declaratory judgment on whether its policies provided coverage for a

---

3. Our decision to continue with the conflicts analysis is further supported by our conclusion that, regardless of a conflict, this action should proceed under the procedure prescribed in *Shugart* for, in the absence of any conflict, we apply the law of the forum State. *Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn.App. 1987), rev. denied (Minn. Jan. 28, 1988). Likewise, for reasons that we will detail, to the extent that there is a conflict, we conclude that the laws of Minnesota should govern.

4. According to Hartford, this case should be governed by California law since the policy was issued in California to a California insured. However, because the Minnesota Supreme Court "has abandoned the lex loci doctrine in favor of the 'choice influencing considerations' methodology," *Milbank Mut. Ins. Co. v. U.S. Fidelity,* 332 N.W.2d 160, 163 (Minn.1983), California law does not govern, as Hartford has urged, merely because the policy was issued in that State.

punitive damage award. The policies were issued in Georgia, where—contrary to Minnesota law—the insurability of punitive damages was allowed. Although the Court recognized, as we recognize here, that the plaintiff's claim was based upon an insurance contract, it noted that "without the underlying tort action which occurred in Minnesota there would be no dispute." *Id.* at 744. Since the insured, who was not a resident of Minnesota, manufactured products for use in Minnesota, the Court reasoned that it was foreseeable that an accident involving one of those products could arise in any State. *Id.* Quoting language from a Minnesota Supreme Court decision that involved automobile insurance policies, the Court observed: "[I]nsurance protection has no geographical boundaries 'and it is foreseeable that the insured may meet his misfortune out of the state of issuance' of a policy." *Id.*, quoting *Hime v. State Farm Fire & Cas. Co.*, 284 N.W.2d 829, 833 (Minn.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).

Likewise, in *Bd. of Regents of U. of M. v. Royal Ins.*, 503 N.W.2d 486 (Minn.App.1993), rev'd on other grounds, the Minnesota Court of Appeals applied Minnesota law to interpret an insurance policy issued in New York to corporations residing in that State. After settling with the manufacturers on a *Miller–Shugart* basis, the plaintiff sued the insurers of the manufacturers for damages associated with the abatement of asbestos-containing insulation. Notwithstanding that the policy was issued in New York, the Court found the predictability of result factor to be neutral. In so finding, the Court reasoned that the insurers "must have been aware" that its insureds did business in all 50 states, "making it predictable that the insured would be sued throughout the country, not only in New York." *Id.* at 490. See also, *American States Ins. v. Mankato Iron & Metal*, supra at 1443 (since insurance protection has "no geographical boundaries," predictability of result is not advanced by applying the law of

the State in which the insurance contract arose).

We are persuaded by the reasoning in the *Goodyear Tire, Bd. of Regents,* and *Mankato Iron* decisions, and conclude that the predictability of results factor should be given little consideration. Given that SensorMedics did not restrict its operations to California, Hartford was on notice that its insured was at risk of suit in other states, and that the law of those states may be applied to interpret its policy.[5]

In so concluding, we are not persuaded that *Jepson v. General Cas. Co. of Wisconsin*—which is cited by Hartford—holds that predictability will always favor the party seeking to apply the law of the contracting State. Upon a careful reading, *Jepson* is distinguishable from the circumstances of this case. There, the Court interpreted an automobile policy in accordance with North Dakota law, which was the State in which the contract was issued, notwithstanding the fact that the policy was sold through a Minnesota agency, and the plaintiffs were Minnesota residents. Given that the policy was calculated using North Dakota rates, which were substantially less expensive than the rates that pertained in Minnesota, and covered named insureds who resided at a North Dakota address and whose vehicles were registered and titled in North Dakota, the Court determined that the parties had bargained for a North Dakota insurance contract, and thus were entitled to the benefit of their bargain. *Id.* at 470–71. Indeed, testimony indicated that, had the policy been written at higher rates, the insurance agent may have lost the sale. *Id.* at 468. In contrast, Hartford has not set forth any evidence which suggests that it bargained with SensorMedics for an insurance policy with the mutual expectation that the interpretation of that policy would be governed by California law. In the absence of such evidence, the mere fact that the policy was issued in California is not determinative of the parties' expecta-

5. Although the parties have not furnished the Court with a copy of the policy, we are not aware of any provision that mandates the application of California law as governing the interpretation of that policy in suits filed in other states, so as to suggest that the contracting parties had intended to be bound by California law. See, *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 726 F.Supp. 740, 744 (D.Minn.1989), aff'd, 920 F.2d 487 (8th Cir.1990).

tions.[6] In our view, to hold otherwise would thwart the *Jepson* Court's direction "to be true to the method rather than to seek superficial factual analogies between cases and import wholesale the choice of law analysis contained therein." *Id.* at 470.[7]

The second factor—maintenance of interstate order—concerns "whether the application of Minnesota law would manifest disrespect for [the other State's] sovereignty or impede the interstate movement of people and goods." *Id.* at 471. Evidence of forum-shopping, or that application of Minnesota's law would promote forum-shopping, would indicate such disrespect. *Id.* This consideration requires that the State, whose laws are ultimately applied, "have sufficient connection with the facts at issue." *Klimstra v. State Farm Auto Ins. Co.*, 891 F.Supp. 1329, 1336 (D.Minn.1995), aff'd. sub nom, *Klimstra v. Granstrom*, 95 F.3d 686, 690–91 (8th Cir. 1996), citing *Hague v. Allstate Ins. Co.*, 289 N.W.2d 43, 48 (Minn.1979), aff'd, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981).

Here, Minnesota has stronger contacts with this action than California. Specifically, the agreement that is sought to be enforced, which terminated an action that was filed and litigated in Minnesota, and which concerned underlying tortious conduct that had, in large part, occurred in Minnesota, was negotiated in Minnesota as a consequence of Court-supervised mediation. Given the extensive contacts Minnesota has with the present litigation, maintenance of interstate order favors the application of Minnesota law. Here, there is no evidence that MedGraphics has engaged in forum shopping, or has participated in any other conduct which would re-flect disrespect for the sovereignty of California. Cf., *Jepson v. General Cas. Co. of Wisconsin*, supra at 471 (in bringing suit in Minnesota, to secure greater benefits than would have been available under North Dakota law, the Court found evidence that the plaintiff was forum-shopping, for he had previously commenced litigation in North Dakota, arising from the same accident, to secure a benefit payable under North Dakota law).

The third factor, which relates to the simplification of the judicial task, is most often considered insignificant because Courts can just as easily apply another State's laws as their own. See, *American States Ins. v. Mankato Iron & Metal*, supra at 1444. As noted above, however, California law, as to the enforceability of no-action clauses, is unclear. In contrast, "the Minnesota decisions speak with one voice in their interpretation of *Miller–Shugart* agreements, agreeing that a settlement made before an insurer acknowledges coverage is not a violation of the duty to cooperate." *McNicholes v. Subotnik*, 12 F.3d 105, 108 (8th Cir.1993). We find this factor to modestly favor the application of Minnesota law. See, *Richie v. Paramount Pictures Corp.*, 532 N.W.2d 235, 239 (Minn. App.1995) (since New York law on defamation was unclear, the Court concluded that the judicial task would be made simpler if the Court applied Minnesota law), rev'd on other grounds, 544 N.W.2d 21 (Minn.1996); cf., *Hime v. State Farm Fire & Cas. Co.*, supra at 833 (because each State's law is clear, and thus could be applied without practical difficulty, simplification of the judicial task is not a significant factor).

---

**6.** Moreover, in view of the fact that, in *Jepson*, the plaintiff was injured in Arizona, the Court found it unlikely that the parties could have foreseen the application of Minnesota law. *Jepson v. General Cas. Co. of Wisconsin*, 513 N.W.2d 467, 471 (Minn.1994) ("Perhaps the parties might have predicted that, had [plaintiff] been injured in one of the vehicles in Minnesota, Minnesota law might be applied."). Here, in contrast to *Jepson*, the underlying tortious conduct, as well as the conduct of the litigation, and the resultant settlement negotiations, occurred in Minnesota.

**7.** The second decision, that has been relied upon by Hartford to support its choice of law analy-sis—*Heritage Mutual Ins. Co. v. Croix Circuits*, No. CX–95–1354, 1996 WL 118297 (March 19, 1996)—does not support Hartford's argument. Although the Court found that the law in Wisconsin and Minnesota differed as to the enforceability of no-action clauses, it did not, contrary to Hartford's assertion, exclusively rely on Wisconsin law. Rather, the Court independently applied both Minnesota and Wisconsin law, and determined that, because the *Miller–Shugart* settlement that the plaintiff sought to enforce, was not reasonable, it was not necessary for it to choose which State's law should be applied. *Id.* at *3.

The fourth consideration addresses "which choice of law most advances a significant interest in the forum." *Jepson v. General Cas. Co. of Wisconsin,* supra at 472. This factor is intended to insure that Minnesota Courts are not called upon to apply rules of law inconsistent with Minnesota's concept of fairness and equity. *American States Ins. v. Mankato Iron & Metal,* supra at 1444, citing *Hime v. State Farm Fire & Cas. Co.,* supra at 833. In our considered judgment, application of California law, to the extent that it would give effect to the no-action clause, would contravene Minnesota's well-established policy, as reflected in the judicial procedure prescribed by *Miller v. Shugart,* supra, of providing meaningful protection to those insureds whose insurers have unreasonably refused to participate in defending a claim or in settling the ensuing action. Moreover, a recognition of *Miller–Shugart* settlements advances Minnesota's interest in promoting the just and inexpensive resolution of actions pending in this State. We conclude, therefore, that the advancement of the forum's governmental interests favors the application of Minnesota law.

The final choice influencing factor concerns which forum has the better rule of law. The better rule of law is the rule that makes "good socio-economic sense for the time when the court speaks." *Jepson v. General Cas. Co. of Wisconsin,* supra at 473, quoting Robert A. Leflar, *Conflicts Law: More on Choice–Influencing Considerations,* 54 Calif.L.Rev. 1584, 1588 (1966). This factor, however, applies only when the first four factors do not clearly resolve the choice of law question. *Nesladek v. Ford Motor Co.,* 46 F.3d 734, 740 (8th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 67, 133 L.Ed.2d 28 (1995), citing *Myers v. Government Employees Ins. Co.,* 302 Minn. 359, 225 N.W.2d 238, 244 (1974). As our analysis to this point plainly reflects, we conclude that the choice of law question is clear and, therefore, we need not decide whether, in any objective sense, Minnesota or California has the better rule of law.

In sum, we conclude that Minnesota law should apply to the interpretation of the no-action clause and, since the no-action clause is unenforceable under Minnesota law, Hartford's Motion for leave to Amend, so as to incorporate an affirmative defense that is premised upon such a clause, is denied.[8]

2. *Failure to Cooperate.* Next, MedGraphics argues that Hartford's second proposed defense—SensorMedics' asserted failure to cooperate with Hartford—is futile and, therefore, unavailing. Specifically, MedGraphics argues that, as opposed to not cooperating, SensorMedics provided assistance to Hartford by making available, for Hartford's review, "all of the tens of thousands of documents and many depositions taken during the underlying litigation." *MedGraphics' Memorandum in Opposition to Hartford's Motion to Amend,* at p. 4.

Where, as here, a party opposes an amendment on the ground of futility, leave to amend an Answer in order to assert an affirmative defense should be denied "only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient" defense. *Miller v. Rykoff–Sexton, Inc.,* 845 F.2d 209, 214 (9th Cir.1988). On the basis of the Record before us, we cannot foresee any inability on Hartford's part, as a matter of law, to establish a viable failure to cooperate defense. While MedGraphics may ultimately establish that SensorMedics kept Hartford suitably informed, we leave this fact-driven determination to a later day.

Next, MedGraphics complains that the Motion is untimely, and that MedGraphics would be severely prejudiced if the Motion were granted. As to timeliness, we are mindful that all Motions to Amend pleadings were to be served by September 1, 1996, and that, therefore, the present Motion should be considered within the framework of Rule 16(b), Federal Rules of Civil Procedure. *Alholm v. American S.S. Co.,* 167 F.R.D. 75, 77 (D.Minn.1996). Under Rule 16(b), a Court's Scheduling Order "shall not be modified ex-

---

8. Because we conclude that the no-action defense is futile, we need not, and do not consider MedGraphics' alternative argument, that Hart-

ford's Motion to Amend should be denied as untimely.

cept upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." Nevertheless, we do not believe that mindless subservience to the dictates of a Scheduling Order should overshadow our fundamental obligation to achieve a just, speedy, and inexpensive determination of the underlying civil claim, particularly in the absence of any prejudice to the complaining party.

In support of this Motion, Hartford has submitted the Affidavit of its counsel, which avers that prior defense counsel effectively erred in failing to assert the proposed defense. *Affidavit of James T. Martin.* Counsel for Hartford further avers that, at the time that he was retained, in late October of 1996, he was required "not only to respond to substantial outstanding discovery requests from plaintiff but, in addition, he was also required to generate written discovery requests as none had been served prior to your affiant's becoming involved in the case." *Id.* In turn, for prejudice, MedGraphics asserts that, because the period in which to conduct discovery has closed, MedGraphics would be denied the opportunity to explore the factual and legal bases for any claim that SensorMedics failed to cooperate with Hartford in the underlying litigation. Given these respective positions, and under the totality of the circumstances before us, we are persuaded that an onerous burden will not befall MedGraphics if Hartford is permitted to assert this limited defense. In our view, the failure to cooperate claim is implicitly subsumed in the *Miller–Shugart* procedure, and therefore, the character of the litigation is unlikely to change by permitting the requested amendment. As we have noted, a *Miller–Shugart* settlement is not enforceable against an insurer if the insurer is not provided notice of the agreement, or if other critical factors are demonstrated.

In balancing the factors at play, we conclude that, absent prejudice that cannot be rectified by a slight extension of the discovery deadline, Hartford should not be penalized for the asserted errors of its prior legal counsel. Cf., *Granus v. North American Philips Lighting Corp.,* 821 F.2d 1253, 1256 (6th Cir.1987) (11–month period between the initiation of the action and the request for amendment "included a substitution of counsel").

Accordingly, Hartford's Motion to Amend its Answer, in order to assert a claim that SensorMedics failed to cooperate with Hartford in the underlying litigation, is granted. in addition, we will amend our Scheduling Order of October 17, 1996, so as to permit the parties to conduct discovery on the issue of SensorMedics' cooperation with Hartford. Nevertheless, we find no reason—at least at this stage—to extend the dispositive motion and "Ready for Trial" dates, which are set to expire on April 1, 1997, and August 1, 1997, respectively.

NOW, THEREFORE, It is—

ORDERED:

1. That Hartford's Motion to Amend its Answer, in order to add an affirmative "no action clause" defense [Docket No. 17], is DENIED, while Hartford's Motion to Amend its Answer, in order to assert a "failure to cooperate" defense [Docket No. 17], is GRANTED.

2. That Hartford is directed, forthwith, to serve and file a Second Amended Answer as allowed by this Order.

3. That the period during which the parties may conduct discovery on the issue of whether SensorMedics failed to cooperate with Hartford in the underlying litigation shall terminate on **March 15, 1997.**